IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

CARLOS M. RIVERA-VELÁZQUEZ,

> **Plaintiff**

> v.                                    **CIVIL NO. 18-1751(RAM)**

HON. ANDREW WHEELER,

> **Defendant.**

OPINION AND ORDER

RAÚL M. ARIAS-MARXUACH, United States District Judge

Pending before the Court are the Hon. Andrew Wheeler's ("Defendant") *Motion for Summary Judgment* and *Motion to Strike Docket No. 60-2*. (Docket Nos. 44 and 90). For the reasons set below, the Court **GRANTS** the pending motions and dismisses this case **with prejudice**.

## I. PROCEDURAL BACKGROUND

On January 1, 2019, Carlos M. Rivera-Velázquez ("Plaintiff" or "Rivera-Velázquez") filed a *Second Amended Complaint* ("*Complaint*") against the Hon. Andrew Wheeler, then Acting Administrator for the Environmental Protection Agency ("EPA"). (Docket No. 16).[1] Plaintiff claims managers at the Caribbean

---

[1] The current Acting Administrator for the EPA is Michael S. Regan. *See* EPA Administrator, United States Environmental Protection Agency,

Environmental Protection Division ("CEPD"), namely Nancy Rodríguez, José Font ("Font") and Teresita Rodríguez, discriminated against him because of his service-connected disability. Id. at 5-12. He also claims hostile work environment and retaliation, all in violation of the Rehabilitation Act of 1973 ("the Rehabilitation Act" or "the Act"), 29 U.S.C § 701 et seq.; and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C § 2000-1 et. seq. Id. at 12-13. Thus, he seeks damages, a merit increase to a GS-13 position, back pay since November 2015 for the salary difference between a GS-12 and GS-13 position, and attorney's fees and costs. Id. at 13-14.

On March 4, 2021, Defendant filed a *Motion for Summary Judgment* ("MSJ") and a *Statement of Material Facts in Support of Motion for Summary Judgment* ("SMF") averring that Plaintiff's disability discrimination claim is unmeritorious because he failed to show he had a disability covered by the Rehabilitation Act and that he suffered an adverse employment action. (Docket Nos. 44-1 at 4-10; 46). Defendant also argues Rivera-Velázquez's hostile work environment claims are unwarranted because he did not prove the circumstances surrounding those claims were sufficiently severe to affect his work conditions. Id. at 11-32. Alternatively,

---

https://www.epa.gov/aboutepa/epa-administrator (last visited March 31, 2022). *See also* Fed. R. Civ. P. 26(d).

Defendant maintains to have had legitimate, nondiscriminatory reasons for his actions and that Plaintiff's subjective beliefs to the contrary are not pretext for discrimination under the Act or Title VII. Id. at 32-35. Lastly, Defendant states Rivera-Velázquez failed to establish a sufficient nexus between his protected conduct and the alleged retaliatory acts. Id. at 35-39.

On April 21, 2021, Rivera-Velázquez filed a *Memorandum of Law in Opposition to Motion for Summary Judgment* ("*Opposition*") accompanied by a *Response to Defendant's 'Statement of Uncontested Facts'* ("*Response*") and a *Statement of Additional Material Facts* ("*PSMF*"). (Docket Nos. 53-54, 76). Plaintiff claims that whether Defendant regarded him as disabled and whether CEPD management submitted him to adverse employment actions are material facts at issue. Id. at 28-41. He also asserts the hostile work environment at CEPD was severe enough to create an abusive workplace, as evinced by negative job evaluations and threatening behavior by superiors, among other actions. Id. at 42-44. Finally, he contends Defendant's purported legitimate reasons for his actions are a pretext for discrimination. Id. at 44-50. Defendant replied on May 26, 2021. (Docket No. 87).

## II. RULE 56 SUMMARY JUDGMENT STANDARD

Summary judgment is proper under Fed. R. Civ. P. 56(a) "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" <u>White v. Hewlett Packard Enterprise Company</u>, 985 F.3d 61, 68 (1st Cir. 2021) (quoting <u>Celotex Corp. v. Catrett,</u> 477 U.S. 317, 322)). A genuine dispute exists "if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." <u>Alicea v. Wilkie</u>, 2020 WL 1547064, at *2 (D.P.R. 2020) (quotation omitted). A fact is material if "it is relevant to the resolution of a controlling legal issue raised by the motion for summary judgment." <u>Bautista Cayman Asset Co. v. Terra II MC & P, Inc.</u>, 2020 WL 118592, at *6 (D.P.R. 2020) (quotation omitted).

The movant bears the burden of showing a lack of genuine issues of material fact. *See* <u>Feliciano-Muñoz v. Rebarber-Ocasio</u>, 2020 WL 4592144, at *6 (1st Cir. 2020) (citing <u>Celotex Corp.</u>, 477 U.S. at 323). This burden is met when the movant shows that the nonmovant "has failed 'to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" <u>E.E.O.C. v. Kohl's Dept. Stores, Inc.</u>, 774 F.3d 127, 131 (1st Cir. 2014) (quoting <u>Celotex Corp.</u>, 477 U.S. at 322).

The non-movant may defeat summary judgment by evincing, "through submissions of evidentiary quality, that a trialworthy issue persists." <u>Robinson v. Town of Marshfield</u>, 950 F.3d 21, 24 (1st Cir. 2020) (quotation omitted). It "cannot merely 'rely on an

absence of competent evidence but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute.'" Vogel v. Universal Insurance Company, 2021 WL 1125015, at *2 (D.P.R. 2021) (quoting Feliciano-Muñoz, 2020 WL 4592144, at *6). Conclusory allegations and unsupported speculation do not defeat summary judgment. *See* River Farm Realty Tr. v. Farm Family Cas. Ins. Co., 943 F.3d 27, 41 (1st Cir. 2019) (quotation omitted).

Local Rule 56 also governs summary judgment. *See* L. CV. R. 56. Per this Rule, a non-movant must "admit, deny or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of material facts." L. CV. R. 56(c). Adequately supported facts shall be deemed admitted unless controverted per the manner set forth in Local Rule 56. *See* Muñiz Negrón v. Worthington Cylinder Corporation, 2021 WL 1199014, at *3 (D.P.R. 2021) (quotation omitted). Litigants ignore this Rule at their peril. Id.

### III. FINDINGS OF FACT

The Court begins with Defendant's *Motion to Strike Docket No. 60-2* ("*Motion to Strike*") filed on May 26, 2021. (Docket No. 90). Defendant claims Rivera-Velázquez's April 17, 2021, *Unsworn Declaration Under Penalty of Perjury (28 U.S.C. 1746)* must be stricken from the record because it is a sham affidavit based on inadmissible hearsay and conclusory statements. Id. On May 28, 2021, Plaintiff opposed the motion, challenging Defendant's

request for the Court to "butcher" the affidavit and asserting Defendant failed to identify which specific parts of the affidavit were inconsistent with Plaintiff's prior testimony. (Docket No. 92). Defendant replied on June 8, 2021. (Docket No. 97). Some of the affidavit's declarations at issue concern whether: (1) Rivera-Velázquez was divested of his Asbestos Hazard Emergency Response Act ("AHERA") duties when CEPD management delegated the duties to the Puerto Rico Environmental Quality Board; (2) John Aponte was the only qualified candidate for an advertised GS-13 Environmental Protection Specialist position, and Plaintiff was thus ineligible; (3) Alex Rivera was able to participate in a 120-ROAD detail at CEPD Industrial Water Team while still performing duties at the Municipal Water Programs Branch, whereas Rivera-Velázquez was not allowed to do the same; and (4) Alex Rivera was notified he could attend a July 2018 Visible Emissions ("VE") training on a "walk-in" basis, but Plaintiff was not told the same. (Docket Nos. 60-2; 97).

A review of the record reveals that the unsworn statement filed at Docket No. 60-2 is an attempt to manufacture an issue of fact and includes new information unsupported by the record, which raises concerns under the sham affidavit rule. To determine whether an affidavit is being used to create a material issue of fact solely to defeat summary judgment, "the court may consider the timing of the affidavit." Rodriguez-Soto v. Presbyterian Med.

Anesthesia Grp., 2019 WL 1349991, at *4 (D.P.R. 2019). Here, the unsworn statement was executed just four days prior to the filing of the *Opposition* and months after the discovery deadline. (Docket Nos. 40, 44, 60-2, 76). While a party may justify a post-summary judgement and post-discovery affidavit, "a party may not use a later affidavit to contradict facts previously provided to survive summary judgment." Escribano-Reyes v. Prof'l Hepa Certificate Corp., 817 F.3d 380, 385 (1st Cir. 2016) (quotation omitted).

Here, Rivera-Velázquez failed to proffer any explanation as to why he waited to file the affidavit until **after** the MSJ. Further, the "new" information therein is not material to the resolution of this case and only provides self-serving allegations meant to controvert Defendant's SMF. Thus, the Court will strike Plaintiff's sworn statement at Docket Number 60-2 from the record and facts ¶¶ 264-266, 312-314, 333-337, 342-343 in the PSMF are deemed unsupported. *See e.g.*, Santiago-Rivera v. Hosp. Gen. Menonita de Aibonito, 2021 WL 1627538 (D.P.R. 2021); Vazquez-Santiago v. Edwards Lifesciences Tech. Sarl, LLC, 2021 WL 3518808, at *6 n. 2 (D.P.R. 2021) (finding that inconsistencies in affidavit "are not material and have no bearing in our analysis[.]")

To make findings of fact, the Court analyzed the SMF, the *Response*, the PSMF, Defendant's *Response To Plaintiff's Statements Of Additional Facts,* Plaintiff's *Surreply To Defendant's Response To Plaintiff's Statement Of Material Facts* and Defendant's

*Supplemented Response To Plaintiff's Statements Of Additional Facts*. (Docket Nos. 46, 53-54, 89, 99 and 103). After only considering facts properly supported by a record citation, uncontroverted and material to the resolution of the pending MSJ, the Court proceeds to set out its findings of fact.

## A. General Information About the Parties

Plaintiff is a GS-12 physical/environmental scientist at the CEPD. (Docket No. 46 ¶ 1). The CEPD implements environmental programs in Puerto Rico and the Virgin Islands, and reports to the EPA's Region 2 Office in New York. Id. ¶ 2. Rivera-Velázquez was an active military member and in the Reserve from 1991 to 2013, reaching the rank of Captain. (Docket No. 54 ¶ 4).

In 2001, after applying for veteran preference with supporting documents, Plaintiff was approved for a 10-point preference status for hiring, considering his service-connected disability of left trapezius myositis. (Docket Nos. 46 ¶ 4; 54 ¶ 5). He was interviewed for an Environmental Scientist position at CEPD by Font and Carlos E. O'Neil ("O'Neil"). Given that his application stated he had a 10-point preference status, Rivera-Velázquez understands that Font and O'Neil knew of his service-connected disability. (Docket Nos. 45 ¶ 5; 54 ¶ 6).

Plaintiff's first role at CEPD was a GS-7 position. (Docket No. 46 ¶ 9). His career ladder capped at GS-12, *i.e.* a senior position at CEPD. (Docket Nos. 46 ¶ 10; 56 ¶ 40). He reached GS-

12 in 2004. (Docket Nos. 46 ¶ 11; 54 ¶ 221). During his progression
to GS-12, Font was the CEPD's Deputy Director. (Docket No. 46 ¶
12).

   In 2003, Plaintiff was tasked with implementing the Clean Air
Act ("CAA") Section 112r's regulations for risk management plans
in Puerto Rico and the United States Virgin Islands. Id. ¶ 222.
Section 112r mostly deals with chemical accident prevention
at facilities using substances that may be harmful if released.
(Docket Nos. 46 ¶ 60; 54 ¶ 229). Plaintiff conducted seminars on
accident protection under Section 112r, CAA inspections and
investigations, and regulated facilities for compliance with
pertinent regulations, permits and federal requirements. (Docket
Nos. 46 ¶ 224; 54 ¶¶ 241, 243). Teresita Rodriguez, Plaintiff's
branch manager and supervisor from 2006 to 2012, admitted that
performing inspections pursuant to Section 112r was not included
in Plaintiff's original job description and that it "came up
later." (Docket No. 54 ¶ 237). Further, while she did not consider
Plaintiff an expert in Section 112r or any field he worked on,
she testified "he was working to get there." (Docket Nos. 46 ¶
31; 54 ¶ 239). Lastly, in 2003, Rivera-Velázquez also became
responsible for coordinating with federal on-scene coordinators
in Puerto Rico and the EPA Region 2 Emergency Remedial Response
Division in Edison, New Jersey. (Docket No. 46 ¶ 223).

   Plaintiff has been a member of the American Federation of

Government Employees Union ("AFGE" or "the Union") since 2001, and has held leadership positions, such as shop steward and Local Third Vice President. Id. ¶ 6. The collective bargaining agreement applicable during the relevant period to this suit was the one entered by AFGE and the EPA in December 2006. Id. ¶ 7.

During Font's tenure as CEPD Deputy Director, Plaintiff received several awards and recognitions, including for his role in litigation against the Puerto Rico Department of Education for violations of Toxic Substance Control Act ("TSCA") and asbestos requirements. Id. ¶¶ 220-221. Likewise, when O'Neil and Teresita Rodríguez were his immediate supervisors, and Teresita Rodríguez and Font were senior management, he received multiple U.S. EPA awards, medals for commendable services, and the New York Federal Executive Board award. Id. ¶ 225. Lastly, in 2016, while Carmen Guerrero ("Guerrero") was the CEPD's Director and Nancy Rodríguez was his immediate supervisor, Plaintiff was awarded the Superior Accomplishment Recognition Award. Id. ¶ 226.

**B. Rivera-Velázquez's Service-Connected Disabilities**

Before 2012, the Department of Veterans Affairs ("VA") had only diagnosed Plaintiff with a 10-point service-connected disability for a left trapezius myositis. ¶ 66. In 2012, Rivera-Velázquez described this impairment as "intermittent and very mild," and that only extreme physical activity caused him inflammation and discomfort. Id. ¶ 67. He was prescribed

conditioning exercises and anti-inflammatory medicines, but no longer needs those medications. Id. Plaintiff also stated he was not experiencing side effects or limitations from his trapezius myositis and could perform all the essential duties of his job without reasonable accommodation. Id. ¶¶ 68-69.

Pursuant to Plaintiff's VA medical charts, his Post-Traumatic Stress Disorder ("PTSD") was first diagnosed on August 27, 2012, during his Compensation and Pension evaluation. Plaintiff's army tour from September 2009 to November 2010, which occurred primarily in Afghanistan, was considered as part of his Military History. (Docket Nos. 46 ¶ 229; 54 ¶ 159).

Plaintiff testified that Teresita Rodríguez, his supervisor when he returned from Afghanistan, allegedly perceived that his personality had changed when he returned from active service and she was "concerned why [Plaintiff] reported back to work in an earlier time, and she always wanted to know [about Rivera's] well-being in terms of [his health] how did [he] feel." (Docket No. 54 ¶ 48). Furthermore, he felt he was regarded as disabled due to Teresita's constant questions of "How are you feeling today? Do you want to take some time off? Everything OK with the family? With the kids? With your wife?" Id. ¶ 49. Lastly, she purportedly showed concern for Rivera-Velázquez and told him she was worried he "might need ... to take a break or some time out." Id. ¶ 50.

On March 2017, Guerrero and other CEPD management, including

Nancy Rodríguez, learned of Rivera-Velázquez's PTSD when they were copied on emails related to paperwork for his Workers Compensation Claim filed before the Department of Labor stating that he had been receiving treatment for worsening PTSD. (Docket Nos. 46 ¶ 158; 54 ¶ 340). Plaintiff admitted that neither Font, Nancy Rodríguez, nor Teresita Rodríguez ever told him he was mentally disabled, or that he was unreliable due to mental instability. (Docket No. 46 ¶ 228). Nancy Rodríguez further testified that she was not aware that Rivera-Velázquez had a medical condition limiting his ability to do his job or that he had no work limitations to perform his duties. Id. ¶ 156.

By July 2017, Plaintiff had two service-connected disabilities, as diagnosed by the VA: (1) left trapezius myositis with a 20% disability rating; and (2) PTSD with a 30% disability rating. Id. ¶ 157. On this same date and considering mitigating measures such as medical treatment by the VA, **Plaintiff admitted his service-connected disabilities did not limit his ability to perform major life activities**. Id. ¶ 160. Further, at least as of July 2017, Rivera-Velázquez could perform the essential functions of his job at CEPD without special accommodation. Id. ¶ 161.

### C. EEO Complaint No. 2011-0020-R02R

On January 20, 2011, Rivera-Velázquez filed his first complaint before the EPA Office of Civil Rights, claiming discrimination based on disability after not being selected for a

promotion to the EPA Criminal Investigator GS-1811-12/13 role which he had applied for. (Docket Nos. 46 ¶ 63; 54 ¶ 7). He claimed that when interviewing for the position in 2010, he was on active duty in Afghanistan and his direct supervisor was Teresita Rodríguez. (Docket No. 54 ¶ 8). During the interview, the interviewers allegedly expressed more concern about his disability and ability to complete the training for the role than whether he had the qualifications for it. Id. ¶ 9.

The EPA sent a letter to Plaintiff's AFGE representative accepting his claim of discrimination and identifying the allegation to be investigated. (Docket No. 46 ¶ 64). Rivera-Velázquez was advised he had five (5) days to aver if he disagreed as to how his claim had been identified. He did not modify the claim. Id. ¶ 65.[2]

On January 17, 2012, the EEOC sent Plaintiff its Final Agency Decision stating it found he had failed to state a claim regarding his allegation that he was not selected for the Criminal Investigator role. (Docket No. 89-2 at 2). It further found he failed to set forth a *prima facie* case of disability discrimination per Section 504 of the Rehabilitation Act. Id. This EEOC Complaint

---

[2] Notably, in the Equal Employment Opportunity Commission ("EEOC") complaint, Plaintiff did not name Font, Teresita Rodríguez, Nancy Rodríguez, Guerrero, Jaime Géliga ("Géliga") or Javier Laureano ("Laureano") as officials who discriminated against him. (Docket No. 46 ¶ 70).

is Rivera-Velázquez's first protected conduct. (Docket No. 46 ¶ 71).

### D. Rivera-Velázquez's Work at CEPD

Francisco Claudio ("Claudio") is an Engineer who began working at the EPA's Enforcement and Superfund Branch under O'Neil's supervision in 1997. (Docket No. 54 ¶ 11). Claudio was not a veteran, did not have disabilities, and, as far as Plaintiff was concerned, had not filed claims before the EEOC. (Docket No. 46 ¶ 124). Claudio was the only employee responsible for CAA enforcement and compliance until the CEPD hired Rivera-Velázquez in 2001. (Docket No. 54 ¶ 18). Plaintiff was ultimately delegated all enforcement and compliance work related to National Emissions Standard for Hazardous Air Pollutants ("NESHAPS") and AHERA asbestos, for which he was credentialed to work on. Id. ¶¶ 20, 86. When the EPA began establishing the program under CAA's Section 112r and required one person be responsible for the same, Rivera-Velázquez was assigned this task. Id. ¶¶ 21, 25.

### E. CEPD Management's Post-2006 Reorganization and Rivera-Velázquez's Initial Issues with Supervisors

In 2006, the CEPD was reorganized into three branches: (1) the Multimedia Permits and Compliance Branch ("MPCB"), where Plaintiff was assigned as an enforcement officer and environmental scientist; (2) the Municipal Waters Programs Branch ("MWPB"); and (3) the

Resources Conservation and Recovery Act ("RCRA") and Remediation Branch. (Docket Nos. 46 ¶¶ 36-37; 54 ¶ 45). The MPCB focused on three areas: (1) the CAA; (2) the Clean Water Act ("CWA"), which addressed industrial discharges, pesticides, fungicides, rodenticides and TSCA; and (3) managed the San Juan Bay Estuary Program. (Docket Nos. 46 ¶ 38; 54 ¶ 42).

In 2006, Teresita Rodríguez replaced O'Neil as the MPCB's Branch Chief, where she remained until 2011. (Docket Nos. 46 ¶ 40; 54 ¶ 41). In 2011, and until 2012, she was CEPD's Acting Deputy Director, with part-time duties at the MPCB. (Docket No. 46 ¶ 41). Afterwards, the MPCB's Branch Chief position was held by different people on temporary 120-day intervals. Id. ¶ 42. Following Teresita Rodríguez, the position was held by José Soto, José Rivera, Edna Villanueva and Carlos Villafañe. (Docket Nos. 46 ¶ 43; 54 ¶ 44). The last person to hold the role was Nancy Rodríguez, who took over from January to May 2014, and was selected permanent Branch Chief in June 2014. (Docket No. 46 ¶ 43). Edna Villanueva and Carlos Villafañe came from the MWPB while José Soto and José Rivera came from the MPCB but focused on water protection. None of them had expertise in asbestos or special training in issues regarding air quality. Id. ¶¶ 44, 51. Nancy Rodríguez came from the RCRA and Remediation Branch where she had worked as a Remedial Project Manager. Id. ¶ 45.

During their tenures, José Soto, José Rivera, Edna Villanueva and Carlos Villafañe reviewed Plaintiff's inspection reports, in line with the review process previously set by Teresita Rodríguez. Id. ¶¶ 46-47. This process remained in place even after Nancy Rodríguez became the permanent Chief. Id. ¶ 48.

Soon after Nancy Rodríguez became Branch Chief and Plaintiff's supervisor, Rivera-Velázquez and Claudio raised concerns as to her lack of preparation and training in air quality, specifically CAA's Section 112r, and that she was micro-managing their performance as EPA inspectors. (Docket Nos. 46 ¶¶ 50, 52; 54 ¶¶ 52, 59, 92). Plaintiff's concerns about her qualifications stemmed from a 2013 investigative report issued by the Office of Inspector General ("OIG") addressed to EPA Management where the Inspector General communicated concerns regarding the lack of training and knowledge on behalf of supervisors who oversaw CAA Section 112r inspections. (Docket No. 54 ¶ 60). CEPD management knew about the report. Id. ¶ 61.

Rivera-Velázquez admitted to not raising the same concerns for José Soto, José Rivera, Edna Villanueva and Carlos Villafañe when they were Branch Chiefs. (Docket No. 46 ¶ 51). Due to Nancy Rodríguez's lack of training in CAA, CEPD management and the Division of Emergency Response decided that personnel in New Jersey would review Plaintiff and Claudio's inspection reports, while she became certified to review such matters. (Docket Nos.

46 ¶¶ 53, 55; 54 ¶ 67). Rivera-Velázquez and Claudio were aware
their reports were being reviewed by EPA colleagues elsewhere.
(Docket No. 46 ¶ 56). Moreover, and as admitted by Plaintiff, per
EPA Order 3500.1, Nancy Rodríguez had one (1) year to obtain a
working knowledge in matters related to her oversight of
inspection reports, and during this time she could rely on senior
managers to help her review the reports. Id. ¶ 58. Nancy Rodríguez
admitted she did not have certifications regarding the CAA's
Section 112r, as she took the courses as a supervisor where she
was only required to have general knowledge on the matter. Id.
¶¶ 61-62. She also admitted that when she became Branch Chief,
Rivera-Velázquez and Claudio had more knowledge and experience
than her regarding the CAA. (Docket No. 54 ¶¶ 69, 93).

        Due to Plaintiff's concern with the lack of proper
supervision, Plaintiff forwarded communications to John Higgins
("Higgins"), who supervised the New Jersey Section 112r program,
and copied Font, to find a solution regarding the supervision of
his Section 112r work. Id. ¶ 75. Rivera-Velázquez alleged Font
took his communications with Higgins personally. Id. ¶ 76. As a
result, Font called Plaintiff, in an angry tone, to ask him why
he was not consulted before Plaintiff reached out to Higgins. Id. ¶
77. Font told him that if he had issues with the supervision of
Section 112r, he was to report directly to him. Id. ¶ 78. After
this incident, Plaintiff was still supervised by Nancy Rodríguez.

Id. ¶ 81. After Higgins retired, and Ellen Banner took over his role, an agreement was reached for her and her staff to continue reviewing Rivera-Velázquez's inspection reports, but they would still be signed by Nancy Rodríguez. Id. ¶ 82.

### F. Rivera-Velázquez's 2011-2013 PARS vis-à-vis his 2014 Mid-Year PARS

Plaintiff's work at CEPD is assessed according to a Performance Appraisal Recognition System ("PARS"), which evaluates him on three (3) Critical Elements ("CE"). (Docket No. 54 ¶ 95). These elements are whether the employee: (1) Achieves Program Results and Outcomes; (2) Contributes to Branch Goals; and (3) Contributes To Effective Outreach To The Public, Regulated Community And Government Officials. (Docket No. 60-3). In his April 29, 2011 Mid-Year PARS evaluation, Teresa Rodríguez rated Rivera-Velázquez as "Fully Successful." (Docket No. 54 ¶ 101). During his PARS for FY 2010-2011 (i.e. October 1, 2010, through September 30, 2011), she rated his work "Fully Successful" as to CEs #1 and #2 and "Exceeds Expectations" as to CE #3. (Docket No. 61-1 at 1-9). She also rated Plaintiff as "Outstanding," as to all CEs in his FY 2011-2012 PARS. (Docket Nos. 54 ¶¶ 99-100; 61-1 at 10-21). His FY 2012-2013 PARS showed ratings of "Exceeds Expectations" as to CEs #1 and #3 and "Fully Successful" as to CE #2. (Docket No. 61-1 at 23-31).

On April 24, 2014, Nancy Rodríguez provided Rivera-Velázquez

with his Mid-Year PARS evaluation. (Docket No. 54 ¶ 96). She explained in an attachment to the evaluation that while he was rated "Fully Successful" in CE #1, his level of performance merited a "minimum satisfactory" rating given his delivered work product and that in at least one case he worked on in 2012, "the inspection reports that [Plaintiff] prepared in 2012 … were deficient and not final reports." (Docket No. 60-3 at 11). She explained that he was rated "fully successful" in CE #1 because he "was not placed on a performance assistance plan during the appraisal year." (Docket No. 54 ¶ 98).

### G. 2014-2015 Union Grievances

In 2014, Plaintiff filed two union grievances against CEPD management, and Nancy Rodríguez in particular, denouncing alleged violations to his contract and a hostile work environment. (Docket No. 46 ¶¶ 72-73). The first grievance was filed on September 25, 2014. (Docket Nos. 46 ¶ 73; 56 ¶ 150). The grievance generally alleged that while on sick leave as directed by physicians at the San Juan Veteran Administration Hospital, Nancy Rodríguez called Plaintiff on his personal cellular phone requesting time and attendance information and the status of pending work deliverables. He also denounced her last-minute shift in priorities. (Docket No. 56 ¶ 149). The second grievance was filed on October 2, 2014 against Nancy Rodríguez and Font denouncing hostile work environment and alleging they were impeding his

ability to work productively and advance in his career. (Docket Nos. 46 ¶ 73; 56 ¶ 151).

On January 1, 2015, Plaintiff, Union representatives, and the agency management labor relations representative executed an agreement initially settling the grievances and whereby the Union withdrew all of Plaintiff's claims. This included both grievances and all charges of unfair labor practices. (Docket Nos. 46 ¶ 74; 54 ¶ 152).

Brenda Reyes ("Reyes") is a GS-13 Public Affairs Specialist at CEPD where she works for the Director's Office and has held position in the Union. (Docket Nos. 54 ¶ 153; 65-1).  The parties initially agreed to settle the grievances by establishing a Work Team with union representatives and CEPD management to address these issues at CEPD. (Docket No. 54 ¶ 156). The Work Team was composed of Ramon Torres and Font as CEPD representatives, and Rivera-Velázquez and Reyes as Plaintiff's representatives. Id. ¶ 157. According to Reyes, Font arrived at the first meeting in 2015 of the work group "with a cocky attitude, visibly aggressive and threatening." Id. ¶ 158. Font allegedly "got so aggressive that he stood up and threw his body over the table in direction towards where [Rivera-Velázquez] was sitting and, with a threatening tone of voice and menacing arms and hands movements reached out close to [Rivera-Velázquez]'s body." Id. ¶ 159. Reyes understood that Font was unwilling to comply with the agreement

and the meeting was called off. Id. ¶¶ 160-161. On June 2, 2015,
Rivera-Velázquez informed the EPA regarding the reasons why
settlement of the Grievances was rescinded. Id. ¶ 163. The Union
withdrew from the agreement, arguing CEPD management was not
holding up its part. (Docket No. 46 ¶ 75). Plaintiff chose to not
reinstate his claims or file any more grievances after 2015. Id.

### H. Tallaboa Industrial Park / HOMECA Case and Prelude to the OIG Investigation

The Tallaboa Industrial Park / HOMECA ("Tallaboa-HOMECA")
case was a collaboration between CEPD and the EPA's Division of
Enforcement and Compliance ("DECA"). (Docket No. 59-5 at 21).
Plaintiff managed the investigation in Puerto Rico. Id. He alleges
his first investigation for that case occurred in November 2013.
(Docket No. 55-1 at 45).

While Plaintiff was working on the case, on August 21, 2014,
Héctor Vélez, Lead General Counsel for the Office of Regional
Counsel ("ORC"), sought guidance from the Office of Enforcement
and Compliance Assurance ("OECA"). This after Respondents in a
CAA Unilateral Order related to the Tallaboa-HOMECA case
questioned the EPA officers' credentials during a settlement
conference. (Docket No. 46 ¶ 76). The ORC mainly sought guidance
regarding the required training under EPA Order 3500.1 for Region
2 CAA inspectors and how an officer could be considered
credentialed to conduct asbestos NESHAPs inspections. Id. ¶ 77.

Rivera-Velázquez had previously presented evidence that in May and June 2002 he had completed training with the Department of Navy regarding asbestos. These trainings referred to asbestos accreditation under the TSCA. Id. ¶ 78. In 2011, Plaintiff provided these certificates as evidence of having the required training under NESHAPs for Hazardous Air Pollutants. Id. ¶ 79.

In 2014, Rivera-Velázquez understood he had all the trainings to conduct inspections under NESHAP and Nancy Rodríguez, his supervisor at the time, believed his credentials were up to date, too. Id. ¶ 81. Moreover, Teresita Rodríguez testified that while she was Plaintiff's immediate supervisor, i.e. from 2006 until 2012, she believed he was certified under CAA section 112r and never raised any concerns with Plaintiff regarding the certifications, even though she subsequently realized he was missing some requirements. (Docket Nos. 46 ¶ 82; 54 ¶ 109). She further conceded that prior to 2013, she and O'Neil were responsible for certifying and ensuring Rivera-Velázquez had all his trainings, qualifications, and certifications and that she had failed to verify "well" if Plaintiff had all his credentials. (Docket Nos. 46 ¶¶ 82, 108, 110; 54 ¶ 124). She acknowledged that Plaintiff's eventual referral to the OIG regarding issues with his credentials could have been avoided if she had verified that he had met all the requirements. (Docket No. 46 ¶ 111).

On August 22, 2014, Julie Tankersley, Supervisory Program

Analyst from OECA, responded to the ORC's request for guidance about the EPA Order 3500.1 required training for a Region 2 CAA Inspectors for CAA-NESHAP Asbestos inspections. Id. ¶ 83. After verifying the CAA training requirements with Rivera-Velázquez's training records, she found that although he had approximately 90% of all required trainings, he was missing several mandatory items. (Docket Nos. 46 ¶ 84; 54 ¶ 112). Based on these results, CEPD management sought guidance from Region 2 in New York and Washington D.C. regarding how Rivera-Velázquez's missing trainings could affect ongoing enforcement investigations like the Tallaboa case where he was the lead inspector. (Docket No. 46 ¶ 85). Nancy Rodríguez was then informed by Plaintiff and Claudio that they knew they did not have a specific training on asbestos, APTI350, because the same was unavailable at the time. Id. ¶ 86.

In August 2014, Rivera-Velázquez was asked by CEPD management to not work the Tallaboa case given his credentialing issues. (Docket Nos. 46 ¶ 88; 54 ¶ 111). He testified that as far as he understood, when he performed the inspection of the Tallaboa-HOMECA facility and rendered his first report in November 2013, the June 2014 EPA Order 3500.1 did not apply. (Docket No. 54 ¶ 105). Further, at an unspecified date, Rivera-Velázquez and Claudio discussed with Nancy Rodríguez their understanding that the concerns regarding their lack of training were misplaced.

She informed them they needed to comply with the Region 2
instructions. (Docket Nos. 46 ¶ 89; 54 ¶ 108). After August 2014,
and after being asked to take the missing trainings to comply
with the newly implemented EPA Order 3500.1 inspector
requirements, Plaintiff proceeded to complete the missing
trainings. (Docket Nos. 46 ¶¶ 90, 118, 122; 56 ¶ 113). By the end
of 2014, Rivera-Velázquez thought he had all the trainings to
continue working on the Tallaboa project. Id. However, he was told
the project was reassigned to the New York Office for Air
Compliance Branch, to be overseen by Victor Tu, then the regional
asbestos and AHERA coordinator. Id. ¶ 91. It had been reassigned
because while Plaintiff was receiving training, the project needed
an inspector with all their credentials, thus the DECA offered to
assign it to Region 2. (Docket No. 89-10). Font testified that
the New York office then took jurisdiction over all asbestos-
related work and that the CEPD does not currently perform
asbestos work. (Docket No. 46 ¶ 92).

Management at Region 2 ordered that the matter regarding
inspector certifications be referred to the EPA OIG for a
third-party review. As a result, a referral letter was drafted
to the Inspector General, with participation and guidance from
Teresita Rodríguez, Font and Region 2 management. Id. ¶ 94. Nancy
Rodríguez averred she was not involved in the referral process.
Id. ¶ 95. On October 1, 2014, Font addressed a letter to Arthur

Elkins, Jr., the EPA's Inspector General, referring for investigation the OECA's findings regarding Plaintiff's mandatory training issue. Id. ¶ 97. As a result, the EPA opened an investigation, which included other employees, aside from Rivera. Id. ¶ 98.[3]

### I. The OIG Investigation

Natalie Vowell ("Vowell") was assigned by the OIG as lead investigator for the claims against Plaintiff. (Docket Nos. 46 ¶ 100; 54 ¶ 125). She was referred to Plaintiff's case by her supervisor once Font's October 1, 2014 letter was received through the OIG hotline. (Docket Nos. 45 ¶ 100; 54 ¶ 132). Because she is a criminal investigator, Vowell testified that when she first receives a referral, she considers if there is a criminal aspect to the allegations, before moving to analyzing potential civil or administrative wrongdoings. She stated that in Plaintiff's referral, there were no instructions to investigate if he had engaged in criminal activities. (Docket No. 46 ¶¶ 102, 105).

Per the OIG's Investigation Report on February 12, 2015, the Office of Investigations "received the allegation that

---

[3] Plaintiff's deposition and EEO Affidavit for case 2017-0057-R02 state that the other employee subject to the investigation was Claudio, who was also challenging CEPD's issues with his credentials. However, Plaintiff failed to proffer additional evidence sustaining this. (Docket Nos. 46-2 at 43; 46-25 at 5).

Carlos M. Rivera, Environmental Scientist ... falsified his
certifications pertaining to the mandatory trainings required
for his credentials." (Docket No. 54 ¶ 136). The OIG then
investigated whether Rivera-Velázquez violated any of the
following criminal statutes: (1) False Statement pursuant to 18
U.S.C. Sec. 1001; (2) Official Certificates or Writings pursuant
to 18 U.S.C. Sec. 1018; (3) False, Fictitious or Fraudulent claims
pursuant to 18 U.S.C. 287; and (4) Forging or Falsifying Official
Government records or documents under EPA Order 3120.1. Id. ¶
137.

     As part of her investigation, Vowell reviewed the
allegations, interviewed witnesses, and gathered evidence. Id. ¶
126. She produced an investigation report, including summaries of
witness interviews, which was reviewed by her supervisor, and
then by the deputy and assistant inspector general for
investigations who signed the report and allowed it to be released
to the agency. Id. ¶¶ 127-128, 130. After conducting her
investigation, Vowell found that the criminal claims were
unsupported, and that Plaintiff "had not intentionally done
anything that was incorrect." (Docket No. 46 ¶ 106). Instead,
the investigation found that, due to omissions by CEPD
management, a general weakness existed as to adequate training
records for inspectors, and that numerous CEPD inspectors were
missing mandatory trainings. Id. ¶ 107. Vowell further concluded

that Nancy Rodríguez and Teresita Rodríguez were among the
supervisors responsible for the credentialing issue for which
Rivera-Velázquez was submitted to investigation by the OIG.
(Docket No. 54 ¶ 143). Ultimately, the OIG concluded the
allegations against Rivera-Velázquez were "unsupported" and it
"was determined from EPA policies that the responsibility to
ensure the required training was properly completed rested with
managers, not inspectors." (Docket No. 61-2 at 4-5). Based on
Vowell's findings, the matter was referred to the EPA OIG's
Office of Programs Evaluations for reformation and follow-up,
and to OECA for its consideration. (Docket No. 46 ¶ 112).

**J. The Outcome of the OIG Investigation**

Guerrero joined CEPD as Deputy Director in July 2016 where
she met Géliga, Claudio and Nancy Rodríguez. Id. ¶ 113. Soon
after, several staff members asked for an update on the OIG
report. Id. ¶ 114. She contacted the Mission Support Division,
who informed her the OIG report had been completed around June
2016, and that it was going through a review process. She was
also told that a meeting would eventually be convened to discuss
the report's results. Id. ¶ 115. She held a staff meeting in 2017,
where she notified the staff that the investigation was closed and
discussed the result of the OIG report and whether any
administrative actions taken as a result. She confirmed this
information by sending out an email to all CEPD employees on

February 27, 2017. Id. ¶ 117.

On August 22, 2016, Nancy Rodríguez was informed of the findings of an internal audit conducted by Kathleen Malone, Acting Deputy Director of the EPA Region 2 DECA, where she revised the inspector credential requirements for the inspectors within the Region to ensure they met the EPA Order 3500.1 requirements. Id. ¶ 119. As a result, in early 2017, Plaintiff took several NESHAPs trainings, as recommended by Malone, to recertify his inspector credentials. Id. ¶ 120. The training was based on the newly implemented EPA order 3500.1 and applied to all currently credentialed inspectors. Plaintiff took the training to not have his credentials questioned again. Id. ¶ 121.

### K. Rivera-Velázquez's Return to the Tallaboa-HOMECA case

In 2017, CEPD management asked Plaintiff to reassess the work that had been done in the Tallaboa case in 2015 and 2016 because, according to him, "there was a work plan that was developed by [Victor Tu] in New York [...] that was not being executed the way EPA intended the facility to execute." (Docket No. 54 ¶ 146). Nancy Rodríguez testified that Plaintiff's participation was focused on integrating a work plan for Tallaboa, and that the CEPD was considering giving Rivera-Velázquez field oversight on that plan. (Docket No. 46 ¶ 129). While the project lead had been taken over by Tu, if an inspection was needed, Rivera-Velázquez would conduct the investigation and report to

the group. Id. ¶ 128.

Plaintiff was included in an email invitation to a meeting scheduled for March 2, 2017, starting at 2:00pm, that had been organized by Nancy Rodríguez. The subject of the meeting was the PR Olefins/Tallaboa case, specifically the findings of a visit on February 17, and the scope of an upcoming NESHAPs inspection. Id. ¶ 125. Rivera-Velázquez testified that he received the invitation for the meeting late, as he was not at his computer at the time. However, he could not confirm whether he might have received the invitation to the meeting at the same time as the rest of its participants. Id. ¶ 126. As a result, Rivera-Velázquez testified he did not attend the meeting, claiming he was "excluded" from the same, and only found out it had taken place afterwards from a coworker who had attended. (Docket Nos. 46-2 at 83-84; 55-1 at 20-21). In May 2017 there was a follow-up meeting regarding the same case and organized by Nancy Rodríguez. All the same participants as the March 2, 2017 meeting were invited, as was Guerrero. Plaintiff conceded he actively participated in that meeting by phone. (Docket No. 46 ¶ 127).

After returning to work on the Tallaboa-HOMECA case, he later told Guerrero he preferred to not continue working on it. According to him, at first, he thought the agency felt "obligated" to give him back the case he had started, and "when [he] voiced his concerns on the status of the facility and the actions that the agency

needed to take," the agency allegedly made him feel like he was overreacting. (Docket No. 54 ¶ 148). Guerrero testified that to the best of her recollection, Rivera-Velázquez told her he did not feel comfortable visiting the facility. (Docket No. 89-13 at 2). She also stated she thought he participated in two site inspections in the summer of 2017 and after which he told her did not want to be involved anymore. Id. at 3.

**L. 2015 120-Day ROAD Temporary Detail**

On February 10, 2015, Rivera-Velázquez applied to a 120-day ROAD detail for a Physical Scientist Position advertised on February 4, 2015 at the MWPB under Géliga's supervision. (Docket Nos. 46 ¶ 130; 54 ¶ 165). Its purpose was to provide support to the MWPB after Alex Rivera went to a 120-day detail with the MCPB. Id. Plaintiff was selected for the detail in March 2015. (Docket No. 46 ¶ 130). CEPD management, including Nancy Rodríguez, endorsed Rivera-Velázquez's appointment to the detail, but advised him that commitments for the 2015 fiscal year required discussions to determine an effective start date. Id. ¶ 131. On March 18, 2015, Plaintiff met with Nancy Rodríguez to address the specifics of when to begin the detail. (Docket No. 54 ¶ 168). He disagreed with CEPD management's request regarding his compliance with his enforcement commitments before fixing a start date. Hence, on June 3, 2015, he presented a letter rescinding the detail. (Docket Nos. 46 ¶¶ 132-133; 54 ¶ 170).

**M. Rivera-Velázquez's 2016 Desk Audit**

In November 2016, Plaintiff requested a desk audit to determine if his position as an Environmental Scientist was appropriately graded as a GS-12 because he wanted to be promoted to GS-13. (Docket No. 46 ¶ 13). The audit was performed by Ms. Cynthia Hughart, a classifier in Human Resources Division at EPA's office in North Carolina. Id. ¶ 14. She has never worked out of Region 2, nor does she report to Region 2's Chief of the Human Resources Branch. Id. She received all the documents, including a questionnaire where Rivera-Velázquez explained his duties, responsibilities and tasks, as well as Nancy Rodríguez's response to the same, and handled the auditing process alongside her supervisors in North Carolina. (Docket Nos. 46 ¶ 15; 54 ¶ 174). She provided her recommendations to Region 2 in May 2017 and on May 26, 2017, she informed Plaintiff that his position was accurately graded as GS-12. (Docket No. 46 ¶¶ 15- ¶ 16). She explained the classification may only be compared to the Office of Personnel Management ("OPM") position classification guidelines and is based on the current duties assigned by management and performed by Plaintiff. Comparison to others who may not be properly classified is not permitted. Id. While Plaintiff was informed of his rights to seek an appeal or review of his desk audit result, he did not appeal the results. Id. ¶ 17. He avers the EPA concluded that his

2001 Job description and position were classified as GS-12 solely because of Nancy Rodríguez's responses. (Docket No. 54 ¶ 178).

### N. 2017 EPA ORDER 4711

On March 8, 2017, Rivera-Velázquez sought guidance from Barbara Pastalove ("Pastalove"), Region 2 Chief of Human Resources about his right to request an investigation on claims of workplace harassment by his supervisor Nancy Rodríguez by invoking EPA Order 4711 ("Order 4711") and initiating an EEO Complaint. (Docket Nos. 46 ¶¶ 134-135; 54 ¶¶ 179-180). On March 14, 2017, he presented to Guerrero, through Pastalove, a Claim of Harassment under Order 4711. (Docket Nos. 46 ¶ 136; 54 ¶ 182). Therein he provided a summary of the hostile work environment created by Nancy Rodríguez since 2014 and allegedly supported by Teresita Rodríguez and Font. (Docket No. 54 ¶ 183). He alleged, in general terms, that Nancy Rodríguez and CEPD management stripped him of his duties, created a hostile work environment, obstructed his career ladder opportunities, hindered his request for the 120-Day ROAD Detail, referred him for an OIG investigation, and exhibited harassing non-verbal behavior such as staring and leering at him. Id. ¶ 184. He also denounced that: (1) in a meeting held on February 24, 2017, Nancy Rodríguez had questioned and rejected his recommendation on how to handle a CAA case; (2) on February 24 and March 9, she had imposed training requirements which differed from those applied to other inspectors in MPCB; (3)

on February 28, 2017, she again dismissed his professional input
and experience as to a citizen complaint; (4) on March 2, 2017,
she excluded Plaintiff from a telephone meeting and email
communications related to the Tallaboa Industrial Park/HOMECA
case; and (5) on March 8, 2017, she dismissed his input in another
citizen complaint. Id. ¶ 186.

On March 17, 2017, Guerrero notified Plaintiff that she
was the "Decisionmaker" in the Order 4711 investigation. (Docket
Nos. 46 ¶ 137; 54 ¶ 188). On April 25, 2017, Guerrero established
"Interim Measures" while Rivera-Velázquez's allegations under
Order 4711 were being investigated to minimize disputes between
him and Nancy Rodríguez. (Docket No. 54 ¶ 190). Initially,
Plaintiff stated he could participate in group and team meetings
with Nancy, but later requested not to participate in meetings
or have any contact with her, which Guerrero acted upon. (Docket
No. 46 ¶ 139). Thereafter, throughout 2017, Nancy Rodríguez
continued supervising Rivera-Velázquez's work as an inspector in
the Air Division. His work assignments were decided through her
and conveyed to Plaintiff via his interim supervisor, Géliga,
chief of the MWPB, or Guerrero. (Docket No. 46 ¶¶ 138-139; 54 ¶¶
192-193). Géliga did not have any training, experience or
knowledge about the CAA and its requirements. (Docket No. 54 ¶
194). Thus, he only verified Plaintiff's time and attendance.
(Docket No. 54 ¶ 195). As a result, his work assignments came

from Guerrero. Id.

While acting as decision maker in the Order 4711
investigation, Guerrero took part in Plaintiff's 2016-2017 PARS
Evaluation. Id. ¶ 196. Nancy Rodríguez testified that for the
rating of Rivera's performance evaluation, neither Géliga nor
Guerrero had asked for her feedback, nor did she write a
performance review for Plaintiff. (Docket No. 46 ¶ 187). Géliga
further testified he was unaware of Nancy Rodríguez's involvement
in Rivera-Velázquez's performance rating for November 8, 2017. He
had discussed Plaintiff's performance with Guerrero, and she told
him the ratings that he should receive on each critical element
of his evaluation. Id. ¶ 188. Guerrero also testified that Nancy
Rodríguez was not involved in preparing Plaintiff's November 8,
2017 year-end PARS. Id. ¶ 189.

Guerrero testified that for the 2017 fiscal year, Géliga
followed up on whether Rivera-Velázquez met his compliance
commitments. However, Géliga did not determine which
commitments were to be complied with since he was not Plaintiff's
supervisor in October 2016 or November 2016, when the air program's
commitments took effect. Id. ¶ 190. Hence, Nancy Rodríguez
provided the information regarding the priorities for the 2017
fiscal year. Afterwards, Guerrero and Géliga had, at minimum,
monthly meetings with Plaintiff throughout half of 2017, where
they went through the year's commitments, what he had completed,

and what was still pending. Id. ¶ 191. They followed up with him accordingly. Id. ¶ 192. While Plaintiff had originally received a "Minimally Satisfactory" rating in one of his three CEs, Guerrero testified that his PARS Summary Rating Level was rated "Fully Successful". Id. ¶ 195. Moreover, his final PARS evaluation for fiscal year 2017 was a "fully successful" rating in all CEs and in the summary rating. Id. ¶ 193. Guerrero met with Géliga to discuss Rivera-Velázquez's PARS evaluation and they considered he had not completed most of the commitments assigned to him at the beginning of the fiscal year and mid-way through the year. Id. ¶ 194.

Guerrero also testified that the EPA-AFGE Master Collective Bargaining Agreement states that "summary ratings of Minimally Satisfactory and Unacceptable require a higher level of management review and approval." Hence, EPA Region 2 HR advised her that Rivera-Velázquez should not have received a Minimally Satisfactory rating in his CE #1, since he had not been placed on a Performance Assistance Plan, per the EPA-AFGE agreement. Thus, it was recommended that Plaintiff's CE #1 rating be changed to "Fully Successful." Id. ¶ 196. Further, Géliga did not provide input in Plaintiff's midyear PARS 2016-2017 evaluation, and he believes that Nancy Rodríguez provided her comments to Carmen Guerrero. (Docket No. 54 ¶ 197). Géliga was verbally directed to issue the "Minimally Satisfactory" rating to Rivera-Velázquez by Guerrero.

Id. ¶ 198.

In January 2018, Guerrero received the fact-finding report prepared by Lauren Schaefer and Guerrero presented her decision in June 2018. (Docket No. 46 ¶ 141). When she received the fact-finding report, Guerrero reviewed the document, its exhibits, and witness interviews. Id. ¶ 143. Based on the report, Guerrero determined there was no evidence to establish harassment or bullying. Id. ¶ 144. She considered that Rivera-Velázquez's and Nancy Rodríguez's interactions only showed differences in work-related matters regarding assignments or how to attend these issues. Guerrero did not find it was harassment. Id. ¶ 145.

On June 11, 2018, Guerrero notified Rivera-Velázquez in a meeting with Géliga of her final decision in the Order 4711 investigation. (Docket Nos. 46 ¶ 147; 54 ¶ 202). She testified that, from her analysis of the evidence, it was not proven that harassment, inappropriate behavior, or bullying by Plaintiff's supervisors had taken place or that he had been subject to threats or intimidation. (Docket No. 46 ¶ 146). She further testified she did notice differences of opinion as to what should be the priorities of the MPCB and how to address them. (Docket Nos. 46 ¶ 146; 54 ¶ 203). During the meeting with Rivera-Velázquez and Géliga, Guerrero stated Géliga would remain as his supervisor, but that this arrangement was not indefinite. She

then offered Rivera-Velázquez the option of a lateral transfer to either the MWPB as a CWA inspector, under Géliga's supervision, or the Remediation Waste Management at Resource Conservation and Recovery Act as an inspector at the Response and Remediation Branch under Teresita Rodríguez's supervision. (Docket Nos. 46 ¶ 148; 54 ¶¶ 215, 220; 69-4). If he did not want to transfer to either of those branches, he would return to reporting to Nancy Rodríguez. Id. Plaintiff decided to transfer to MWPB, effective October 4, 2018. (Docket No. 46 ¶ 149). He also admitted that on October 20, 2016, he had requested a reassignment to MWPB, because the move would improve his career ladder opportunities within the EPA. Id. ¶ 150.

### O. 2018 EPA 4711 Order

On January 12, 2018, Laureano informed Plaintiff that a second EPA Order 4711 had been initiated by management without his previous knowledge or consent. (Docket No. 54 ¶ 204). This new investigation was meant to investigate Plaintiff's allegations of retaliation and harassment because of the PARS 2017 rating of "minimally satisfactory" in one CE. Id. ¶ 205. Laureano was appointed Decision maker. Id. ¶ 206.

Laureano testified that in January 2018, Anthony Falconeri ("Falconieri"), the EPA's Labor Relations Specialist, called to tell him that Rivera-Velázquez contacted EEO officer Mavis Johnson alleging to have been the victim of harassment by Nancy

Rodríguez after she gave him a "minimally satisfactory" rating. (Docket No. 46 ¶ 181). Falconeri informed him that Mavis Johnson had decided to proceed with an EPA Order 4711. Id. ¶¶ 182-183.

James Feeley ("Feeley") was named fact finder to investigate the allegations for the Order 4711. Id. ¶ 184. Laureano avers to not having discussed Plaintiff's allegations with Guerrero, Géliga, or Nancy Rodríguez. Id. ¶ 185. After Feely conducted his investigation, Laureano read his report and concluded that Nancy Rodríguez had not provided any input regarding Plaintiff's rating during the 2017 fiscal year. Id. ¶ 186. On July 13, 2018, Laureano notified Rivera-Velázquez of his final decision to Plaintiff. (Docket No. 54 ¶ 210).

**P. EEO Complaint No. 2017-0057-R02**

Rivera-Velázquez filed an EEO Complaint on April 21, 2017. Id. ¶ 18. He claimed he was discriminated against because of his disability and retaliated against by his immediate supervisor, Nancy Rodríguez. Amongst other remedies, he requested reassignment to a different supervisor and management chain. (Docket No. 46 ¶ 151). The claims in the 2017 EEO Complaint were like those submitted in the first EPA Order 4711 investigation and included allegations of hostile work environment, harassment and discrimination based on disability and reprisals and noted prior 2011 EEO activity, the OIG investigation and two Grievances.

(Docket No. 54 ¶ 189). He also submitted allegations regarding additional adverse employment actions such as having to request a Desk Audit, CEPD management's questioning of his professional judgment and undermining his seniority, exclusion from awards and meetings, physically threatening behavior by Font, as well as being perceived as "unstable." Id.

Via letter, the EPA Office of Civil Rights accepted Rivera-Velázquez's claim and identified the conduct to be investigated. (Docket No. 46 ¶ 152). His EEO complaint included the same claims as his EPA 4711 Order investigation regarding incidents on February 24, February 27, March 2, and March 8-9, 2017. (Docket No. 67-2).[4] Plaintiff did not modify the allegations. (Docket No. 46 ¶ 152).

For example, Rivera-Velázquez alleged that on February 24, 2017, he met with Nancy Rodríguez to discuss the strategy as to how to manage a citizen's complaint received in January 2017. Id. ¶ 168. Per his EEO Complaint, Plaintiff takes issue with the fact that Nancy Rodríguez waited until the last minute to act upon his suggestions. (Docket No. 46-25 at 8-10). Conversely, Nancy Rodríguez states Plaintiff's recommendations, as shown by a March 7, 2017 email, were duly followed. (Docket No. 46 ¶ 169). Rivera-Velázquez failed to properly controvert this allegation. Moreover,

---

[4] See supra, Findings of Fact, Section titled "2017 EPA ORDER 4711."

during the February 24, 2017 meeting, Nancy Rodríguez was not aware Plaintiff had a medical condition which may affect him. Id. ¶ 170.

In his investigative affidavit, when asked to explain how his disability was a factor in the conduct at issue in his complaint, Rivera-Velázquez averred he had reason to believe CEPD management officials had shared his disability diagnosis and had labeled him as "unstable" and "not trustworthy"; that asking for different training requirements was a way of humiliating him and that Nancy Rodríguez had questioned his CAA advice because of his disability. (Docket No. 46-25 at 11, 14, 18, 22 and 26).

When asked how the alleged conduct harmed the terms and conditions of his employment, Plaintiff stated he believed the employment actions meant he was being disrespected by people who should be "role models," it undermined his competitive status as a CAA inspector and it affected his morale, self-esteem and reputation. (Docket No. 46 ¶ 155). Plaintiff also identified his previous 2011 EEO case (2011-0020-R02) and Union grievances as the protected activity he had performed to that time. Id. ¶ 162. Nancy Rodríguez was unaware Rivera-Velázquez had been involved in protected activities through a previous EEO case before filing Complaint 2017-0057-R02. Id. ¶ 154.

After April 16, 2018, the EEOC issued its Final Agency Decision for EEO Complaint No. 2017-0057-R02. It stated it found Plaintiff had failed to establish he was subject to hostile work

environment, harassment, or retaliation due to his disability and reprisals. (Docket No. 46-46).

**Q. EEO Complaint No. 2018-0136-R02**

On September 17, 2018, Rivera-Velázquez filed a third complaint before the EPA Office of Civil Rights claiming retaliation. (Docket Nos. 45 ¶ 172; 54 ¶ 326). The EPA Office of Civil Rights sent him a letter accepting his claim of retaliation and identifying the allegation to be investigated. Rivera-Velázquez did not modify his claim. (Docket No. 46 ¶ 173).

Therein Plaintiff claimed he was subject to retaliation because of his previous EEO complaints 2011-0020-R02 and 2017-0057-R02 when on June 11, 2018 and July 12, 2018, he received adverse decisions to his two Order 4711 investigations. Id. ¶ 174. He also claimed he was retaliated against when Géliga, his interim supervisor, canceled his training request for a VE recertification scheduled for August 2018 in Texas. Id. ¶ 175. Plaintiff states the second EPA Order 4711 is of questionable origin, given that it was presented without his authorization. His complaint also stated that he contacted the EEO Manager in EPA Region 2 to report harassment and hostile work environment due to a "minimally satisfactory" rating received from Nancy Rodríguez in CE #1 of his PARS for fiscal year 2017. Id. ¶ 176. He clarified he communicated with the EEO to report his claims of the "minimally unsatisfactory" rating to amend his existing EEO Complaint under

case no. 2017-0057-R02 and not to initiate another Order 4711 investigation. Id. ¶ 177. His EEO Complaint No. 2017-0057-R02 was eventually amended to include this claim. Id.

Pastalove testified that once an employee raises an issue, even if they decide not to continue with the Order 4711, the Branch may compel processing under EPA Order 4711 depending on the matter. Id. ¶¶ 178-179. The record is unclear as to the Final Agency Decision to the EEO Complaint No. 2018-0136-R02.

### R. Request for GS-13 Promotion

Since Nancy Rodríguez began evaluating Plaintiff's performance, he let her know about his interest in being promoted to a GS-13 level. (Docket No. 54 ¶ 248). Nancy Rodríguez, as a MPCB branch chief, can speak to the needs of her branch, regarding whether there is a need for more staffing or in anticipation of case developmental problems that may arise. The Division Director is then authorized to petition a GS-13 level position with the OPM's Human Resources office. (Docket No. 46 ¶ 19). Pastalove explained that regarding merit promotions, the announcement for the position would have identified the selection criteria for eligibility and consideration. Id. ¶ 20. Once the merit promotion is posted in USA Jobs, any eligible person interested in the position can apply. Id. ¶ 21. Pastalove also explained that preselection under the merit promotion process would be inappropriate. Id. ¶ 22.

Nancy Rodríguez further testified that she cannot ask for a position to be tailored for a specific person. Id. ¶ 23. If there is a job posting for a promotion, for which Plaintiff believed he was eligible, he should have applied and competed for it. (Docket Nos. 46 ¶ 23; 54 ¶ 250). She also acknowledged that Rivera-Velázquez was qualified to apply to a GS-13 in environmental scientist, environmental engineer, and physical scientist positions. (Docket No. 54 ¶ 252). Further, she testified that before 2018, while she was still supervising Plaintiff, she made a verbal appeal to Guerrero for her to request a GS-13 position for the interdisciplinary positions of physical scientist, environmental scientist, and environmental engineer within her branch, a position she believed Rivera-Velázquez was eligible to apply for. (Docket Nos. 46 ¶ 24; 56 ¶ 253). Guerrero then had conversations with OPM to get approval for a GS-13 vacancy, which was posted and went through the selection process within her branch. (Docket No. 46 ¶ 25).

While Nancy Rodríguez stated it was not her decision to offer Rivera-Velázquez a GS-13 position, she did work with him to develop his career. As an example, she testified she increased his evaluations to nine or ten a year from his previous four or five. She also testified that she supported him when he sought a seven-month leadership training and by offering him a training opportunity in risk management. Id. ¶ 30. Moreover, she

recommended he apply to a GS-13 position open in Washington and
that "[t]he opportunity [was] filed under the 112r program that
he worked and [she] understood that [Plaintiff] could be
eligible." (Docket No. 54 ¶ 255). While the record is unclear if
Plaintiff applied to the position, Nancy Rodríguez testified that he
told her the detail was for one year which would "be too long."
(Docket No. 59-5 at 35).

Teresita Rodríguez acknowledged that she never recommended
Rivera-Velázquez for a merit promotion to GS-13. (Docket No. 54 ¶
246). However, she also testified that promoting Plaintiff to a GS-
13 position would not be automatic. The career ladder for his
position is GS-12 and a GS-13 promotion would have occurred once
the Director, branch chief or supervisor identified a need for
such a position and the resources for it became available.
(Docket No. 46 ¶ 26). Additionally, while supervisors may grant
promotions within a person's career ladder, to go beyond the
ladder, OPM must authorize the promotion. Id. Font also echoed
that even if there is a need for a GS-13 position in CEPD, they
would have to seek authorization from Region 2 in New York. Id.
¶ 27. He further testified the only GS-13 positions or technical
scientific positions are the on-scene coordinators or remedial
project managers in the Superfund Program. Id. ¶ 28.

In 2017, Rivera-Velázquez expressed his frustration by the
"stagnation" of his career development at CEPD since he had not

been promoted to a GS-13, while Alex Rivera had been able to transfer from MWPB to MPCB and was given a GS-12 without having prior experience as an air enforcement inspector under the CAA. Id. ¶ 163. Prior to transferring to MPCB, Alex Rivera had been an inspector under the CWA at the MWPB with a GS-12 grade. Id. ¶ 164. In 2018, Rivera-Velázquez completed a lateral transfer of his own, as an inspector to the MWPB for which he did not have a year's worth of previous experience. His GS-12 grade was honored, as he was not downgraded, just like Alex Rivera, when he moved to MPCB. (Docket Nos. 46 ¶ 165; 46-2 at 97-98). Furthermore, Plaintiff conceded that upon transferring to MPCB's CAA enforcement program, Alex Rivera was subject to the new CAA training requirements per the latest EPA Order 3500.1. (Docket No. 46 ¶ 166).

## S. 2018 Visible Emissions Training Issues

For Plaintiff to be able to take a VE training, he needed to be recommended by his supervisor, Géliga. Then it would go to the CEPD Deputy Director Font to ensure the funds to pay for the training were within the CEPD's budget. Afterwards, a form would be sent to New York via the Office of Mission Support, to pay for the training. Id. ¶ 198. Font was the approving manager for trainings by CEPD employees. Id. ¶ 199.

In January 2018, Rivera-Velázquez took a VE course for which he and another colleague, Alex Rivera, were able to register on-

site. Id. ¶ 212. Due to a late payment for Rivera-Velázquez's training, the contractor Eastern Technical Associates, Inc. ("ETA"), notified Darnelle Gillisslee ("Gillisslee"), the Region 2 Training Officer, and Rivera-Vélazquez that "from now on [Plaintiff] will be required to both pre-register ... and pre-pay registration." (Docket No. 54 ¶ ¶ 307-308).

Rivera-Velázquez and Alex Rivera submitted late requests for the next VE training for July 17-19, 2018 in the Bacardí facility. (Docket No. 46 ¶ 209). On the afternoon of July 17, 2018, Gillisslee notified them they were approved for the training. Id. ¶ 210. Rivera-Velázquez acknowledged receiving the email on July 18, 2018. Id. ¶ 211. As of July 17, 2018, Gillisslee had not yet paid ETA for the July 18 training. (Docket No. 54 ¶ 309). Plaintiff e-mailed Gillisslee stating he would be on stand-by for payment confirmation before proceeding to the training and registering there. Id. ¶ 310. Defendant admitted Gillisslee did not respond to Rivera-Velázquez's email, nor did she confirm if she made the payment. Id.

As of noon on July 19, 2018, the last day of the training, Gillisslee had yet to respond to Plaintiff. Id. ¶ 311. Thus, he notified her that if the payment for the training had not yet taken place, he would take the training in August instead, after discussing the matter with CEPD's Division Director. (Docket Nos.

46 ¶ 214; 54 ¶ 311). Alex Rivera attended the training on July 18, 2018, and payment to ETA was processed without issue on July 24, 2018. (Docket No. 46 ¶¶ 213, 215).

Guerrero testified that while she was not sure if Region 2 had paid the provider, she knows Rivera-Velázquez and Alex Rivera were approved to take the training. Id. ¶¶ 207-208. Further, she stated she assumed that, given that both inspectors were able to register on-site for the training in January 2018, they would have been able to do the same for the July 2018 training. Id. ¶ 212.

Géliga told Plaintiff to take the recertification training scheduled for August 2018, in Arlington, Texas, and approved his training forms. Id. ¶ 200. In August 2018, Géliga asked Guerrero if Rivera-Velázquez could participate in the training. Id. ¶ 201. Guerrero then asked Géliga if Rivera-Velázquez had completed his commitments for the 2018 fiscal year to which Géliga responded he had not. Id. ¶ 202. Thus, she did not recommend he take the training. Id. ¶¶ 202-203. Géliga also stated he understood Rivera-Velázquez was not approved for the training because of his outstanding workload. Id. ¶¶ 204-205.

In October 2018, Rivera-Velázquez transferred to the MWPB and his VE recertification training was no longer required. Id. ¶ 218. By December 2018, due to his reassignment, Géliga approved Plaintiff to take the necessary training for him to be certified

to do his work at MWPB. Id. ¶ 219.

### T. Available 2020 CEPD Positions

In January 2020, a vacancy for an "Environmental Protection Specialist" for MPCB in Guaynabo, Puerto Rico was posted on USAJobs. (Docket No. 54 ¶ 260). The position was a GS-13 with a pay scale of $91,231 to $118,603 per year. Id. ¶ 261. The candidate was required to "[m]anage grants, cooperative agreement, and/or interagency agreement activities related to the initiation, administration, and/or close-out of these agreements." Id. ¶ 262. They were also expected to "spend 25% of [the] work time on contracts, grants/cooperative agreements, and/or interagency agreements." Id. ¶ 262. Plaintiff did not apply for the job.

In April 2020, a temporary or "detailed" position graded at GS-13 for an air inspector became available in CEPD when Alex Rivera, moved from Region 2 to Region 4. (Docket Nos. 46 ¶ 34; 54 ¶ 256). Rivera-Velázquez applied to the position on May 5, 2020. (Docket No. 54 ¶ 257). After, he and three other people applied for the position, the posting was closed because, due to COVID-19, there were less opportunities to perform field work and inspections which was the position's principal objective. (Docket Nos. 46 ¶ 35; 54 ¶ 259). Nancy Rodríguez admitted that if Plaintiff had updated air credentials, he would have been qualified for the role. (Docket No. 54 ¶ 258).

## IV. ANALYSIS

### A. Rivera-Velázquez's Claims under the Rehabilitation Act

Plaintiff raises disability discrimination claims pursuant to the Rehabilitation Act. While Rivera-Velázquez suffered left trapezius myositis and PTSD, the *Complaint* is mainly premised on discrimination because of his PTSD. (Docket No. 46 ¶ 157). As with discrimination claims brought under the Americans with Disabilities Act ("ADA"), Rivera-Velázquez bears the initial burden of proving every element of a *prima facie* disability discrimination claim under the Rehabilitation Act. *See* <u>Calero-Cerezo v. U.S. Dep't of Just.</u>, 355 F.3d 6, 20 (1st Cir. 2004). To establish a *prima facie* disability discrimination claim, he must prove: (1) that he suffered a "disability" within the meaning of the Act; (2) that he was a qualified individual able to perform the essential functions of his job, with or without a reasonable accommodation; and (3) that despite his employer's knowledge of his disability, they failed to offer a reasonable accommodation for the disability. *See* <u>Arce v. Potter</u>, 818 F. Supp. 2d 402, 407 (D.P.R. 2011) (citing <u>Calero-Cerezo</u>, 355 F.3d at 20).

In this context, a disability is defined as "a physical or mental impairment that constitutes or results in a substantial impediment to employment," or a "physical or mental impairment that substantially limits one or more major life activities of such individual ... a record of such an impairment ... or being

regarded as having such an impairment[.]" <u>Rodriguez-Flores v.</u>
<u>United States Gov't</u>, 2021 WL 5570303, *4 (D.P.R. 2021) (quoting 29
U.S.C. § 705(9)(A) and 42 U.S.C. § 12102(a)). It is uncontested
that Rivera-Velázquez is a veteran with service-connected
disabilities, *i.e.*, left trapezius myositis and PTSD. (Docket Nos.
44-1 at 5; 46 ¶¶ 66, 157). Notably, Plaintiff admits that, at least
in 2012, his trapezius myositis impairment was "intermittent and
very mild," and that only extreme physical activity would lead to
inflammation and discomfort. (Docket No. 46 ¶ 67). While he was
once prescribed conditioning exercises and anti-inflammatory
medicines, he no longer needs them. <u>Id</u>. **Nor was he experiencing**
**side effects or limitations arising from said disability and states**
**he was able to perform all the essential duties of his job without**
**accommodation**. <u>Id</u>. ¶¶ 68-69. As of July 2017, Rivera-Velázquez also
conceded his service-connected disabilities of both trapezius
myositis *and* PTSD did not limit his ability to perform major life
activities and that he could perform the essential functions of his
job without reasonable accommodation. <u>Id</u>. ¶¶ 160-161. **This suffices**
**to show he was not disabled for purposes of the Rehabilitation**
**Act**. *See e.g.,* <u>Whitlock v. Mac-Gray, Inc.</u>, 345 F.3d 44, 46 (1st
Cir.2003) (holding that plaintiff could not show he was disabled
within the ADA because he admitted he could do his job despite his
disability).

In the absence of an impairment that hinders his employment or ability to perform a major life activity, Plaintiff must prove in the alternative that his employer either had records of an impediment or otherwise viewed him as having a disability. First, Rivera-Velázquez fails to show that CEPD management had a record of his disability. He claims that on March 2017, Guerrero and other CEPD Management, including Nancy Rodríguez, learned of his PTSD when they were copied on emails related to his Workers Compensation Claim where he stated he was receiving treatment for worsening PTSD. (Docket Nos. 46 ¶ 158; 54 ¶ 340). However, simply being notified that Plaintiff had a service-connected disability is insufficient to show that CEPD management had a record of his impairments. *See* Maldonado v. Cooperativa De Ahorro, 685 F. Supp. 2d 264, 274 (D.P.R. 2010) (quotation omitted) ("Mere knowledge of an impairment does not create a record of an impairment."). *See also* Arce, 818 F. Supp. 2d at 407-09 (finding that a record of disability did not exist when a plaintiff stated that defendant had a record of her "medical conditions" and knew of her impairment but later admitted she never submitted documentation to defendant regarding her disability).

Lastly, Rivera-Velázquez has failed to show that CEPD management "regarded him as disabled." A plaintiff who alleges he is "'regarded' as disabled cannot merely show that his employer perceived him as somehow disabled; rather, he must prove that the

employer regarded him as disabled within the meaning of the [Rehabilitation Act]." Barreto v. Doctors' Ctr. Hosp., Inc., 2016 WL 8710982, at *3 (D.P.R. 2016) (quoting Bailey v. Georgia-Pac. Corp., 306 F.3d 1162, 1169 (1st Cir. 2002)); Mancini v. City of Providence by & through Lombardi, 909 F.3d 32, 45 (1st Cir. 2018). Thus, Plaintiff must show he "had an actual or perceived impairment and that his employer was either aware of or perceived the impairment at the time of the allegedly discriminatory action." Mancini, 909 F.3d at 46. Here, "employer" refers to the person who made the discriminatory decisions, rather than other supervisors in the organization. Id. (citation omitted).

In the case at bar, and as highlighted by Defendant in the MSJ, Rivera-Velázquez only points out some discrete acts of purported discriminatory conduct which he avers are related to his perceived disability. These include an instance on February 24, 2017 where he met with Nancy Rodríguez to discuss the strategy regarding how to address a pending citizen's complaint and how the issue pertained to the CAA. (Docket No. 46 ¶ 168). Plaintiff claimed that in that meeting, Nancy Rodríguez questioned and rejected his recommendations and professional judgment on how to handle a CAA case. (Docket No. 54 ¶ 186). Similarly, on March 2, 2017, she allegedly excluded him from a telephone meeting and email communications related to the Tallaboa-HOMECA case and on March 8, she again dismissed his input in another citizen complaint. Id.

However, Nancy Rodríguez testified, and Plaintiff admitted, that at the time of this meeting, she was not aware Plaintiff had a medical condition that may affect him. (Docket No. 46 ¶ 170).

Beyond these acts, Rivera-Velázquez only generally claims he was stigmatized due to his PTSD.[5] For example, while Plaintiff acknowledges that Nancy Rodríguez never told him he had a mental disability, he avers her behavior, such as purportedly not holding eye contact with him or not agreeing to meet with him alone, led Rivera-Velázquez to understand that she saw him as mentally unstable and discriminated against him as a result. (Docket No. 54 ¶¶ 57-58). Furthermore, he explains that Teresita Rodríguez, his supervisor when he returned from Afghanistan in 2010 until 2012, allegedly perceived his personality had changed after active service and that she "was kind of concerned why [Plaintiff] reported back to work in an earlier time, and she always wanted to know [about Rivera's] well-being in terms of [his health] how did [he] feel." Id. ¶ 48. Plaintiff felt he was regarded as disabled due to Teresita's constant questions of "How are you feeling today? Do you want to take some time off? Everything OK with the family? With the kids? With your wife?" Id. ¶ 49. Lastly, she allegedly

---

[5] The *only* instance on the record where Rivera-Velázquez alleges he was discriminated against because of his trapezius myositis is his allegation that during a 2010 interview for a role at EPA, the interviewers allegedly expressed more concern about his disability than whether he had the qualifications for the job. (Docket No. 58 ¶ 9).

showed concern for Rivera-Velázquez and told him she was worried he "might need ... to take a break or some time out." Id. ¶ 50.

These instances, however, are insufficient to show that Rivera-Velázquez's employers "regarded Plaintiff as disabled" nor "that he was perceived as unfit for a broad range of jobs as a result of his mental condition." Acevedo v. Potter, 2011 WL 7092592, at *9 (D.P.R. 2011), aff'd sub nom. Acevedo v. Donahoe, 448 F. App'x 78 (1st Cir. 2012). "[A] supervisor's expression of concern for an employee's health or wellbeing does not necessarily mean that the supervisor—and by extension, the employer—regards the employee as having an impairment." Saffer v. Bechtel Marine Propulsion Corp., 2020 WL 5363322, at *6 (W.D. Pa. 2020). Moreover, Rivera-Velázquez admitted that neither Font, Nancy Rodríguez, or Teresita Rodríguez ever made comments alluding to him being mentally disabled, or that he was unreliable due to mental instability. (Docket No. 46 ¶ 228). See e.g., Sandbach v. Rafco Clean, LLC, 2020 WL 109591, at *3-4 (E.D. Mo. 2020) (finding that plaintiff did not establish a case of discrimination under the ADA given that she failed to prove her supervisor regarded her as disabled simply "because he was 'short' with her, 'arrogant,' and generally treated her as though she was beneath him" and because he denied telling anyone that plaintiff was a "nut job" or "mentally unstable"); Johnson v. Boardman Petroleum, Inc., 923 F. Supp. 1563, 1568 (S.D. Ga. 1996) (suggesting that supervisor's comments that

plaintiff take time off and seek help did not show they thought plaintiff was disabled to the point where she could not perform her job).

Rivera-Velázquez has not established that his service-connected left trapezius myositis and/or PTSD qualify as disabilities upon which he may assert a disability discrimination claim under the Rehabilitation Act. Therefore, the Court need not address whether he was a qualified individual or if he was denied reasonable accommodation by Defendant because of his conditions. Likewise, because he has failed to show he was disabled, his hostile work environment and retaliation claims under said Act must also fail. *See* McDonough v. Donahoe, 673 F.3d 41, 49–50 (1st Cir. 2012) (affirming dismissal of discrimination claims under the Rehabilitation Act after finding that postal service employee was not regarded as disabled). Rivera-Velázquez's claims under the Rehabilitation Act are **DISMISSED WITH PREJUIDCE**.

## B. Rivera-Velázquez's Title VII discrimination claims

Plaintiff also raised discrimination claims under Title VII. Title VII provides it "shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's **race, color, religion, sex, or national origin[.]"** 42 U.S.C § 2000(e)-2. The statute **does not** provide a cause of action for claims of disability

discrimination. *See* <u>Serrano-Colon v. Dep't of Homeland Sec.</u>, 2021 WL 3034044, at *7 (D.P.R. 2021). Notably, Plaintiff fails to allege in the *Complaint* or in the *Opposition* that he was subject to discrimination on anything other than his service-connected disabilities. Because Rivera-Velázquez's Title VII claims are grounded solely on claims of disability discrimination, his "claims are not cognizable under Title VII and consequently cannot survive dismissal." <u>Arsuaga-Garrido v. Nielsen</u>, 2021 WL 646810, at *3 (D.P.R. 2021) (collecting cases for the proposition that claims of disability discrimination cannot be brought under Title VII). Rivera-Velázquez's discrimination claims under Title VII are **DISMISSED WITH PREJUDICE.**

### C. Rivera-Velázquez Claims of Retaliation

Rivera-Velázquez's *Complaint* avers he has been and continues to be subject to "a pattern of discrimination, harassment, hostile work environment and retaliation for having participated in prior EEO administrative procedures." (Docket no. 16 at 1). Even if a claim for disability discrimination fails, a plaintiff may still assert a retaliation claim. *See* <u>Colon-Fontanez v. Municipality of San Juan</u>, 660 F.3d 17, 36 (1st Cir. 2011) (quoting <u>Soileau v. Guilford of Me., Inc.</u>, 105 F.3d 12, 16 (1st Cir.1997)). When there is a lack of direct evidence of retaliation such as here, Plaintiff must establish a *prima facie* case of retaliation. *See* <u>Henderson v. Massachusetts Bay Transportation Auth.</u>, 977 F.3d 20, 39 (1st Cir.

2020) (quoting <u>Carlson v. Univ. of New Eng.</u>, 899 F.3d 36, 43 (1st Cir. 2018)) (alterations in original). To wit, he must show that: "(1) []he engaged in protected conduct; (2) []he suffered an adverse employment action; and (3) that a causal nexus exists between the protected [conduct] and the adverse action." <u>Id.</u>

Defendant acknowledges Rivera-Velázquez meets the first prong of the test. Namely his EEO Complaints filed in 2011, 2017 and 2018 constitute protected conduct. (Docket No. 44-1 at 36). Furthermore, the Court recognizes that his two EPA Order 4711s, initiated on March 14, 2017 and January 12, 2018 respectively, also constitute protected conduct. (Docket Nos. 46 ¶ 136; 54 ¶¶ 182, 204). Informal protests of discriminatory employment practices such as complaining to management, "writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal changes," are also forms of protected conduct. <u>Garcia-Garcia v. Costco Wholesale Corp.</u>, 878 F.3d 411, 425–26 (1st Cir. 2017) (quoting <u>Planadeball v. Wyndham Vacation Resorts, Inc.</u>, 793 F.3d 169, 175 (1st Cir. 2015)).

1. <u>Adverse Actions</u>

The second prong requires that Rivera-Velázquez show that Defendant, via CEPD management, subjected him to "some objectively and materially adverse action." <u>Orlando Gonzalez Tomasini v. United States Postal Service</u>, 2022 WL 889863, at *25 (D.P.R. 2022)

(quoting <u>Bhatti v. Trustees of Boston Univ.</u>, 659 F.3d 64, 73 (1st
Cir. 2011)). Whether an action is deemed materially adverse is
reviewed on a case-by-case basis. *See* <u>Blackie v. Maine</u>, 75 F.3d
716, 725 (1st Cir. 1996). An adverse employment action "typically
involves discrete changes in the terms of employment, such as
'hiring, firing, failing to promote, reassignment with
significantly different responsibilities, or a decision causing
significant change in benefits.'" <u>Martinez-Taboas v. Universidad
Carlos Albizu, Inc.</u>, 2021 WL 2786256, at *5 (D.P.R. 2021) (quoting
<u>Cham v. Station Operators, Inc.</u>, 685 F.3d 87, 94 (1st Cir. 2012)).
The First Circuit has held that adverse actions also include:
"demotions, disadvantageous transfers or assignments, refusals to
promote, unwarranted negative job evaluations, and toleration of
harassment by other employees." <u>Moran-Ubieta v. Baxter Health Care
de Puerto Rico, Inc.</u>, 2021 WL 4438086, at *12 (D.P.R. 2021)
(quoting <u>Gu v. Bos. Police Dep't</u>, 312 F.3d 6, at 14 (1st Cir.
2002)) (internal quotation marks omitted). Critically, a plaintiff
must show that a reasonable employee would have found the action
adverse, which "means it well might have 'dissuaded a reasonable
worker from making or supporting a charge of discrimination.'"
<u>Rivera v. Municipality of Carolina</u>, 2021 WL 5570307, *16 (D.P.R.
2021) (quoting <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S.
53, 60 (2006)).

Finally, for causality to be established, the plaintiff must show a nexus between the protected conduct and the purported retaliatory act. One way of showing causality is temporal proximity, however, this too has its limits. The First Circuit has explained that "[t]emporal proximity only supports an inference of causation when the record shows 'that the decisionmaker knew of the ... protected conduct when he or she decided to take the adverse employment action.'" Henderson, 977 F.3d at 40 (quoting Planadeball, 793 F.3d at 177). This means that **"[c]ausation moves forward, not backwards, and no protected conduct <u>after</u> an adverse employment action can serve as the predicate for a retaliation clai**m." Rivera, 2021 WL 5570307, at *19 (quoting Henderson, 977 F.3d at 40) (emphasis added). The Court will now address the alleged retaliatory acts in turn.

a. <u>Failure to Promote</u>

Throughout his *Complaint* and *Opposition*, Rivera-Velázquez generally claims he was consistently denied a merit promotion to GS-13, while other employees were promoted to that grade level. (Docket Nos. 16 at 9, 13; 76 at 22, 27, 36 and 41). Specifically, he alleges his failure to promote occurred on a continuing basis since he was promoted to a GS-12 in 2004. Similarly, the record reflects that Plaintiff engaged in various forms of protected activity throughout this same period. In interpreting the facts in the light most favorable to Plaintiff, the Court will assume

*arguendo* that there exists temporal proximity between Plaintiff's request for a promotion and an instance of protected activity.

In a retaliatory failure-to-promote claim, the First Circuit has echoed that a plaintiff must show that they "applied for a particular position ... for which [they] were qualified." Gonzalez-Bermudez v. Abbott Lab'ys P.R. Inc., 990 F.3d 37, 47–48, cert. denied, 142 S. Ct. 389 (2021) (quoting Velez v. Janssen Ortho, LLC, 467 F.3d 802, 807 (1st Cir. 2006)). Merely stating that on some occasions they generally requested a promotion is insufficient. *See* Velez, 467 F.3d at 807. The First Circuit has held that "[t]his specificity requirement is sensible and fair. An open-ended request for employment should not put a burden on an employer to review an applicant's generally stated credentials any time a position becomes available[.]" Guillen-Gonzalez v. JC Penney Corp., 731 F. Supp. 2d 219, 229 (D.P.R. 2010) (quoting *Velez,* 467 F.3d at 807).

Here, there is no genuine issue of fact that Rivera-Velázquez **cannot** meet this burden. Throughout the years, Plaintiff has expressed an interest in being promoted to a GS-13 position after having reached the top of his current position's career ladder in 2004. However, beyond a 2010 EPA Criminal Investigator GS-1811-12/13 role which he had applied for but was not selected, there have been positions open at CEPD and elsewhere within the EPA that Plaintiff chose not to apply to. (Docket No. 54 ¶¶ 7, 255, 260-262);

*see also* <u>Zabala-De Jesus v. Sanofi-Aventis P.R., Inc.</u>, 959 F.3d 423, 430–31 (1st Cir. 2020) (holding that employer did not discriminate against the plaintiff by not hiring him for a certain position because he did not apply to it in the first place). As such, he voluntarily lost his eligibility for promotion to GS-13 as to those roles. *See also* <u>Gonzalez-Bermudez</u>, 990 F.3d at 47 ("As a general rule, it is not for the plaintiff to predict the employer's hiring decision and then claim to be the victim of that predicted decision.") Moreover, the GS-13 position he did apply for was cancelled due to COVID-19. (Docket Nos. 46 ¶¶ 34-35; 54 ¶¶ 256-259).

Plaintiff also argues there is a genuine issue of fact as to whether his different supervisors throughout the years could promote him to a GS-13 position. According to Rivera-Velázquez, other employees such as Claudio were promoted to a GS-13 level through a non-competitive process or through tailor-made positions, whereas Plaintiff had been told this was not possible. (Docket No. 76 at 45). However, Plaintiff failed to proffer *any* evidence, beyond bald assertions that a GS-13 position was supposedly attainable without participating in a competitive process. Font, Nancy Rodríguez and Teresita Rodríguez have consistently asserted they do not have the authority to promote him or single-handedly create a GS-13 position for him. At all times they have reiterated that the process would be for them to

assess the needs of the branch, and then recommend that the Director petition the OPM for the creation of a vacancy announcement for a GS-13 position. (Docket No. 46 ¶¶ 19-23, 26-27). If Plaintiff thought he was eligible for any available position, then he could apply like other candidates. (Docket No. 46 ¶ 23; 54 ¶ 250).

Thus, the record does not support Rivera-Velázquez's contention that supervisors such as Nancy Rodríguez and Teresita Rodríguez could *create* the GS-13 position he thought he deserved, but simply chose not to in his case. For example, before 2018, Nancy Rodríguez, Plaintiff's supervisor at the time, recommended to Guerrero the possibility of requesting a GS-13 position for the interdisciplinary positions of physical scientist, environmental scientist, and environmental engineer. Importantly, she thought Rivera-Velázquez was eligible to apply for this position. (Docket Nos. 46 ¶ 24; 56 ¶ 253). Afterwards, Guerrero spoke with OPM and a vacancy announcement was opened and the selection process ran its course. (Docket Nos. 46 ¶ 25). This shows supervisors could *recommend* a vacancy for a position with a higher grade, but not necessarily *create* a position for an employee. The record is silent as to whether Rivera- Velázquez applied for this position. *See e.g.*, Chambers v. Sebelius, 6 F. Supp. 3d 118, 130 (D.D.C. 2013), aff'd sub nom. Chambers v. Burwell, 824 F.3d 141 (D.C. Cir. 2016) ("the fact that other vacancies were created that allowed other …

employees to be promoted during the time at issue does not support Plaintiff's claim that her supervisors had the authority to create these positions.").

Moreover, in 2016, Plaintiff sought a desk audit to determine whether his job and responsibilities meant that he should be paid at a higher grade. (Docket Nos. 46 ¶ 13). A desk audit is a process where an employee may request that their work be reviewed and "[i]f, in the eyes of the reviewers, that work is at a higher level than that at which the employee is currently graded, the employee will be promoted to the level that is reflected by [his] performance." Achoe v. Clayton, 2020 WL 2769859, at *8 n. 6 (D.D.C. 2020) (quoting Rand v. Sec'y of the Treasury, 816 F. Supp. 2d 70, 72 n.1 (D.D.C. 2011)). A desk audit can also be called an "'accretion of duties' promotion, because the desk audit is meant to trigger a promotion to match the employee's 'accretion of duties' over time." Id. Here, the desk audit concluded that his position was accurately graded as GS-12. (Docket Nos. 46 ¶¶ 14-16; 54 ¶ 174). **Rivera-Velázquez did not appeal the desk audit's result**. (Docket No. 46 ¶ 17).

Thus, Rivera-Velázquez has failed to show that he suffered a material adverse action stemming from a failure to promote. This given that "[f]ailing to promote an employee to a position that does not exist is not enough to establish an adverse action against an employee." Micheo-Acevedo v. Stericycle of Puerto Rico, Inc.,

2017 WL 5152173, at *8 (D.P.R. Mar. 31, 2017), aff'd, 897 F.3d 360 (1st Cir. 2018); see also Chambers, 6 F. Supp. 3d at 132-133 ("Plaintiff points to Defendant's failure to promote her, but absent an available vacancy to which Plaintiff could have applied, or at least a showing that her supervisors had the authority to create such a vacancy and failed to request it, there is no adverse employment action.").

  a. OIG Investigation

    Rivera-Velázquez avers he was subject to retaliation, harassment and hostile work environment when he was referred to the OIG in 2014 concerning issues with his credentials as an air inspector, particularly regarding his asbestos NESHAPs credentials. See supra, the discussion regarding the OIG investigation in Section III, subsections H though K of this Opinion. As a result, during the pendency of the investigation, he was removed from the Tallaboa case of which he was the lead inspector. (Docket Nos. 46 ¶ 88; 54 ¶ 111).

    Rivera-Velázquez has not shown a temporal proximity between any of his protected activity and the OIG investigation. The closest protected conduct to the initiation of the investigation is the EEO Complaint he filed on January 20, 2011, **three (3) years** before Rivera-Velázquez was referred to the OIG. (Docket Nos. 46 ¶ 63; 54 ¶ 7). Lastly, even assuming arguendo that Rivera-Velázquez and Claudio's meeting with Nancy Rodríguez to discuss the issues

with their credentials and the fact that they understood the concerns regarding their lack of training was misplaced is protected conduct, Plaintiff failed to specify when this meeting took place. (Docket Nos. 46 ¶ 89; 54 ¶ 108). He has therefore failed to show that the OIG investigation constituted retaliation.

In any event, it is worth noting that multiple courts have found that mere initiation of an investigation against a person does not amount to an adverse employment action. *See* Davis v. Yellen, 2021 WL 2566763, at *33 (D.D.C. 2021); Tomaszewski v. City of Philadelphia, 460 F. Supp. 3d 577, 600 (E.D. Pa. 2020), appeal dismissed, 2020 WL 7366324 (3d Cir. 2020). An investigation may be adverse if it **"resulted in 'materially adverse consequences affecting the terms, conditions, or privileges of [Plaintiff's] employment or [Plaintiff's] future employment opportunities such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm.'"** Carter-Frost v. D.C., 305 F. Supp. 3d 60, 69 (D.D.C. 2018) (quoting King v. Holder, 77 F.Supp. 3d 146, 151 (D.D.C. 2015)) (emphasis added). Courts have also found that a referral to the OIG "may constitute a materially adverse action when the investigation leads to discipline or causes 'disruption and embarrassment' to the employee." Tomaszewski, 460 F. Supp. 3d at 600 (quoting Harley v. Geithner, 2010 WL 3906642, at *15 (D.N.J. 2010), *aff'd sub nom.* Harley v. U.S. Sec'y of Treasury, 444 F. App'x 594 (3d Cir. 2011)).

Here, while the Court is cognizant that the OIG investigation removed Plaintiff from the Tallaboa case for close to two years, Rivera-Velázquez failed to show he suffered adverse consequences because of the OIG investigation. To the contrary, the OIG concluded the allegations against him were "unsupported" and further found "from EPA policies that the responsibility to ensure the required training was properly completed **rested with managers, not inspectors.**" (Docket No. 61-2 at 4-5). Moreover, he eventually re-joined the Tallaboa case in 2017. The Court concludes that he has not shown that it would dissuade a reasonable employee from making or supporting a charge of discrimination.

   b. Exclusion from March 2, 2017 Meeting

    In his 2017 EEO Complaint, Rivera-Velázquez claims that he was "excluded" from a March 2, 2017 meeting regarding the Tallaboa-HOMECA case and that he only found out it had taken place afterwards from a coworker who attended the meeting. (Docket Nos. 46-2 at 83-84; 55-1 at 20-21). He conceded he was included in an email invitation to the meeting organized by Nancy Rodríguez. (Docket No. 46 ¶ 125). However, he alleges he received the invitation late as he was not at his computer at the time. Id. ¶ 126. Moreover, Rivera-Velázquez could not attest as to whether he might have received the invitation to the meeting at the same time as the other participants. Id.

"[E]xclusion from meetings may qualify as an adverse employment action, depending on the circumstances and the employee's position and role within a company or organization." Pabon v. Vilsack, 2015 WL 859543, at *11 (D.P.R. 2015). Still, exclusion does not automatically qualify as adverse action. For example, in Gu v. Boston Police Department, the First Circuit stated that plaintiff had failed to show how exclusion from a meeting amounted to a change in work conditions when the plaintiffs only made "bald assertions that they were excluded from important meetings and experienced diminished communication regarding office matters, but they were unable to name a particular meeting or important decision from which they were excluded." Gu, 312 F.3d at 15.

Here, while Rivera-Velázquez did provide a date for the meeting and that it was related to the Tallaboa-HOMECA case, he failed to explain what important decisions he was excluded from and how that exclusion affected his conditions of employment. *See e.g.*, Pabon, 2015 WL 859543, at *11 (finding that plaintiff's assertions "do not permit a reasonable inference about the particular content of the meetings or whether or how said content related to" her role, and thus the evidence supporting plaintiff's claim is too conclusory to enable a finding of a materially adverse employment action.)

The purported exclusion from the meeting, when coupled with the rest of the record, cannot be considered an adverse employment action. Moreover, Rivera-Velázquez acknowledged that in May 2017 there was a follow-up meeting also organized by Nancy Rodríguez and he conceded he actively participated by phone. (Docket No. 46 ¶ 127).

Finally, Plaintiff failed to show a link between any protected activity and the purported exclusion. Rivera-Velázquez did not offer *any* evidence, formal or informal, of protected conduct that took place in proximity to the meeting. He has therefore failed to show that purported exclusion was an adverse employment action.

c. Delayed Approval of VE Emissions Trainings

In his 2018 EEO Complaint, Rivera-Velázquez averred that his supervisor, Géliga, retaliated against him by cancelling his training request for Visible Emissions recertification scheduled for August 2018 in Texas. (Docket No. 46 ¶ 175). Guerrero subsequently testified she did not recommend that Rivera-Velázquez take the training given that Géliga informed her Plaintiff had not yet completed his commitments for the 2018 fiscal year. (Docket No. 46 ¶ 202). In his 2018 EEO complaint, Plaintiff identified Rosana Caballer-Cruz ("Caballer-Cruz"), an inspector in the Response and Remediation Branch, as someone who was allowed to travel on August 2018 to Atlanta, Georgia to take a Hazardous Waste Incinerator training to maintain her inspector credentials.

Id. ¶ 216. However, contrary to Plaintiff, when Caballer-Cruz
requested permission to attend the training, she had completed her
requirements for the fiscal year, and did not have excess work
pending. Id. ¶ 217.

Rivera-Velázquez averred he needed the VE training to perform
duties as part of his job, but failed to proffer evidence proving
as much. Hence, even if he had managed to show that Géliga
purposefully prevented him from participating in the training,
which the record does not support, such an action would not be
considered an adverse employment action. *See* Lopez Lopez v.
Robinson Sch., Inc., 2019 WL 1055082, at *5, aff'd sub nom. Lopez-
Lopez v. Robinson Sch., 958 F.3d 96 (1st Cir. 2020) ("The fact
that [plaintiff] never received trainings outside of Puerto Rico,
by itself, does not constitute an adverse employment action,
without showing how it was detrimental to her employment
prospects."); Colon-Fontanez v. Municipality of San Juan, 671 F.
Supp. 2d 300, 332-33 (D.P.R. 2009), aff'd, 660 F.3d 17 ("A refusal
by a supervisor to allow an employee's attendance at a workshop
could constitute such an action if the employee could show that
she experienced a material harm as a result.") (citation omitted).

Even if Plaintiff was able to show an adverse employment
action because of the delayed training, there is no evidence that
Géliga or Guerrero held up his participation due to any protected
activity. Given that he failed to show even an informal complaint

to management prior to requesting the training, the closest protected activity *before* the request would be his 2017 EEO Complaint filed on April 21, 2017. (Docket No. 54 ¶ 187). But this took place **over a year before Géliga's denial.** *See* Calero-Cerezo, 355 F.3d at 25 ("Three and four month periods have been held insufficient to establish a causal connection based on temporal proximity.") As a final note, in October 2018, Rivera-Velázquez transferred to the MWPB and his VE recertification was no longer required. (Docket No. 46 ¶ 218).

Rivera-Velázquez's *prima facie* retaliation are **DISMISSED WITH PREJUDICE.**

## V. CONCLUSION

For reasons discussed above, the Court **GRANTS** Defendant the Hon. Andrew Wheeler's *Motion for Summary Judgment* and *Motion to Strike Docket No. 60-2.* (Docket Nos. 44 and 90). Plaintiff Carlos Rivera-Velázquez's claims against Defendant Hon. Andrew Wheeler are hereby **DISMISSED WITH PREJUDICE.** Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March 2022.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge
